**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**THE ESTATE OF SHERMAN LEE BUTLER,**
by Velma Lynne Wafer, Personal Representative,

Plaintiff,

Case No. 2:26-cv-13871
Hon.

v.

**CRAIG GERRELL GREGORY,**
individually and in his official capacity as a Bailiff of the 36th District Court;
**CHANCELLOR FERRELL,**
individually and in his official capacity as a Detroit Police Officer;
**JOSE MARTINEZ,**
individually and in his official capacity as a Detroit Police Officer;
**CITY OF DETROIT,** a municipal corporation; and
**36TH DISTRICT COURT,** a Michigan governmental entity,

Defendants.

**JURY DEMAND**

**WEBSTER LAW OFFICE, PLLC**
**Dionne E. Webster-Cox (P70422)**
Attorney for Plaintiff
24100 Southfield Road, Suite 100
Southfield, MI 48075
(734) 215-2444 / (734) 943-6069 – Fax
DEWC@WebsterLawOfficePLLC.com

**DAVIS LAW GROUP, PLLC**
**Maurice Davis (P76203)**
Co-counsel for Plaintiff
1300 Broadway St.
Detroit, MI 48226
(313) 462-4755 / (248) 286-6004 - Fax
maurice@michiganinjurylawyer.com

# COMPLAINT

NOW COMES Plaintiff, the Estate of Sherman Lee Butler, Deceased, Velma Lynne Wafer, Personal Representative by and through counsel, and for its Complaint against Defendants Craig Gerrell Gregory, Chancellor Ferrell, Jose Martinez, the City of Detroit, and the 36th District Court, states as follows:

## INTRODUCTION

1. This is a civil rights action brought under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act (ADA), and Michigan state law, arising out of the tragic, preventable, and fatal shooting of Sherman Lee Butler on July 12, 2024.

2. On that date, Defendants knew Mr. Butler was an individual suffering from a severe, acute mental health crisis. Despite having dispatched a specialized Crisis Intervention Team (CIT) and Mr. Michael Yanosy, a mental health clinician, who were minutes away from the scene, Defendants chose to bypass established safety protocols.

3. Defendants aggressively breached Mr. Butler's apartment, escalated the confrontation, deployed non-functioning Tasers, and ultimately shot him multiple times in the chest, torso, and arm, causing his death. This lawsuit seeks redress for the violation of Mr. Butler's constitutional rights and his wrongful death.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, as this action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 12131 *et seq.* (ADA).

5. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in the City of Detroit, Wayne County, Michigan, which is located within the Eastern District of Michigan.

**PARTIES**

7. Sherman Lee Butler was a 44-year-old African American resident of the City of Detroit, State of Michigan. At all times relevant, he resided at 17655 Manderson Road, Apartment 101, Detroit, Michigan.

8. The Estate of Sherman Lee Butler is represented by its duly appointed Personal Representative, who brings this action on behalf of the Estate and its beneficiaries under the Michigan Wrongful Death Act, MCL § 600.2922.

9. Defendant Craig Gerrell Gregory was, at all times relevant, a court officer (Bailiff) acting on behalf of the 36th District Court to execute a court-ordered eviction at 17655 Manderson Road. Defendant Gregory acted under color of state law. He is sued in his individual and official capacities.

10. Although Defendant Gregory's authority to execute the eviction order derived from the 36th District Court, his decision to draw a personal firearm and shoot Mr. Butler was not authorized, directed, or ratified by any judicial officer, formed no part of the execution of the eviction order, and exceeded the scope of his function as a court officer. The manner in which Defendant Gregory carried out the eviction, including his use of deadly force, was independent discretionary conduct for which he bears personal responsibility.

11. Defendant Chancellor Ferrell was, at all times relevant, employed as a police officer by the Detroit Police Department (DPD) and was acting under color of state law. He is sued in his individual and official capacities.

12. Defendant Jose Martinez was, at all times relevant, employed as a police officer (Corporal) by DPD and was acting under color of state law. He is sued in his individual and official capacities.

13. Defendant City of Detroit is a municipal corporation organized under the laws of the State of Michigan. The City operates and manages DPD, a public entity responsible for the training, supervision, and discipline of its officers, including Defendants Ferrell and Martinez.

14. Defendant 36th District Court is a judicial district of the Michigan district court system, located in Detroit, Wayne County, Michigan. The 36th District Court appointed, authorized, and oversaw Defendant Gregory in his capacity as a court

officer executing eviction orders, and is a "public entity" within the meaning of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131(1). Plaintiff asserts claims against the 36th District Court only to the extent permitted by law, including under Title II of the ADA for conduct that also violated the Fourteenth Amendment, and does not seek relief barred by the Eleventh Amendment.

## GENERAL ALLEGATIONS

### Defendants' Knowledge of Mr. Butler's Mental Health Crisis

15. On July 12, 2024, DPD Dispatch received a call to assist Defendant Bailiff Gregory with an eviction at 17655 Manderson Road, Apartment 101.

16. The incident was dispatched as a "Mental Not Violent" run under DPD Dispatch Event ID 2024-194-01943.

17. Prior to DPD officers arriving at the scene, Defendant Gregory explicitly advised responding units that the resident, Mr. Butler, was suffering from a mental illness and was combative and highly agitated.

18. DPD Officers Ferrell and Martinez arrived at the location in full uniform. Recognizing that Mr. Butler was in a state of severe psychiatric crisis, Officer Ferrell requested that a specialized DPD Mental Health/CIT Unit make the scene.

19. DPD Dispatch confirmed the request, and CIT Scout MH-698, carrying mental health clinician Michael Yanosy, was dispatched to the location and was actively en route.

**The Unreasonable Entry and Escalation**

20. Rather than securing a safe perimeter, maintaining distance, and waiting for the specialized CIT unit and mental health clinician to arrive—who were only minutes away—Defendant Gregory and the DPD officers decided to force entry.

21. Defendant Gregory kicked the front door of Apartment 101 until the lock breached, and DPD officers followed him inside.

22. Upon entering, Defendants observed Mr. Butler inside his bedroom, lying on his bed, experiencing an obvious and severe psychiatric episode.

23. Mr. Butler held a yellow box cutter to his own neck, expressing suicidal ideation, telling the officers, "you're going to have to kill me" and "I'm not leaving."

24. The walls of the apartment were covered in gray painted graffiti stating "police killed me" and "murder," further indicating a profound psychological break.

25. Instead of utilizing de-escalation tactics suitable for a psychiatric crisis, the Defendants shouted aggressive commands at Mr. Butler to drop the box cutter, further agitating him.

**The Taser Deployments and the Shooting**

26. When Mr. Butler began to stand up from his bed, Defendant Corporal Martinez deployed his department-issued Taser.

27. Defendant Officer Ferrell followed immediately by deploying a second Taser.

28. Due to lack of training, faulty equipment, or improper deployment, the Tasers failed to achieve neuromuscular incapacitation.

29. According to subsequent DPD expert analysis of the taser log graphs, the Tasers failed to deliver a proper electrical charge due to poor connections.

30. The pain-compliance deployment of the Tasers served only to further panic, disorient, and agitate Mr. Butler, who lunged forward.

31. Defendant Gregory, backed near the bedroom wall, drew his personal .40 caliber Heckler & Koch semi-automatic handgun and fired multiple shots at close range into Mr. Butler's torso, chest, and right arm.

32. Mr. Butler fell to the ground, critically wounded. He was transported by Medic 18 to Sinai Grace Hospital, where he succumbed to his injuries.

**Defendants Ferrell's and Martinez's Violations of Mandatory DPD Directives Enacted to Safeguard Constitutional Rights**

33. The Detroit Police Department maintains written Manual Directives governing how officers must respond to civil-process assignments and to individuals in mental-health crisis. These directives were adopted, in substantial part, to protect the constitutional rights of the citizens with whom officers interact, including the Fourth Amendment right to be free from unreasonable and excessive

force and the Fourteenth Amendment right to personal security and bodily integrity.

34. An independent investigation by the Detroit Board of Police Commissioners, Office of the Chief Investigator (CCR 79425, BPC 25-116), concluded that Defendants Ferrell and Martinez each violated multiple DPD Manual Directives during the encounter with Mr. Butler. Plaintiff alleges these directive violations not as independent constitutional torts, but as evidence that Defendants' conduct was objectively unreasonable and undertaken with deliberate indifference to Mr. Butler's constitutional rights.

35. Mental-Health Crisis Response (DPD Special Order 22-28). DPD directives required officers encountering an individual in a mental-health crisis to attempt de-escalation, disengagement, area containment, and waiting out the subject, and to defer to the specialized Crisis Intervention Team (CIT). Defendants Ferrell and Martinez disregarded this directive by confronting Mr. Butler and forcing the encounter to a violent conclusion rather than waiting for the CIT unit and mental-health clinician who were already dispatched and en route. This directive exists to prevent the very escalation of force that the Fourth Amendment forbids.

36. Protective Custody and Supervisory Referral (DPD Special Order 22-28, Recognizing Abnormal Behavior). DPD directives required an officer who observes a person requiring treatment to take the person into protective custody or,

if in doubt, to summon a supervisor to make that determination. Defendants confronted Mr. Butler before any supervisor or mental-health unit arrived, depriving him of the measured response the directive was designed to ensure.

37. Limited Police Function in Civil Process (DPD Manual Directive 201.1-14). DPD directives provide that an officer's only function at an eviction is to prevent or quell a breach of the peace, and that officers shall not act in a manner that enhances or creates a misperception of the police role. In violation of this directive, Corporal Martinez personally read the eviction notice to Mr. Butler, assuming the bailiff's function and elevating DPD's role beyond keeping the peace.

38. Tactical Positioning of the Bailiff (DPD Manual Directive 201.1-14). In violation of DPD directives, Defendants permitted Bailiff Gregory to enter and remain in the confined bedroom—a "fatal funnel"—during an active threat, restricting his ability to retreat and rendering his resort to deadly force foreseeable.

39. Partner Visualization (DPD Manual Directive 201.1-10). DPD directives required officers to maintain visualization of their partners. Defendants separated during the encounter, leaving no officer positioned to direct Bailiff Gregory and the other officers to stand down before force was used.

40. Taser Use on a Special Population (DPD Manual Directive 304.7-4.4). DPD directives classify a person in acute psychiatric crisis as a member of a "Special Population" subject to heightened restrictions on Taser use. Defendants Ferrell and

Martinez each deployed their department-issued Taser X2 CEWs against Mr. Butler despite his evident membership in that protected class.

41. Professional Courtesy (DPD Manual Directive 102.3-5.2). DPD directives prohibit coarse, profane, or demeaning language toward citizens—conduct that bears directly on the reasonableness of the force used. Officers present used profane and demeaning language toward Mr. Butler during the encounter.

42. Each of these directives was established to protect the constitutional rights of individuals such as Mr. Butler, and each violation made the use of excessive force and the fatal shooting more likely. Had Defendants complied with these mandatory directives, most critically, by waiting for the Crisis Intervention Team and clinician who were minutes away, Mr. Butler's death would have been avoided. (Exhibit 1 – Commission Findings)

**COUNT I: 42 U.S.C. § 1983 —**
**FOURTH AMENDMENT EXCESSIVE FORCE**
**(Against Defendant Craig Gerrell Gregory)**

43. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

44. At all times relevant, Defendant Gregory acted under color of state law.

45. Under the Fourth Amendment, Mr. Butler had a clearly established right to be free from the unreasonable use of deadly force by state actors.

46. Defendant Gregory's use of deadly force was objectively unreasonable, excessive, and unconstitutional under the circumstances.

47. Defendant Gregory knew that Mr. Butler was unarmed with any firearm, was suffering from an acute mental health crisis, and had been subjected to taser shocks. Gregory's decision to fire multiple rounds into Mr. Butler's torso was a disproportionate and excessive reaction.

48. Defendant Gregory's use of deadly force was not authorized or directed by any judicial officer and formed no part of the lawful execution of the eviction order. Whatever immunity may attach to the execution of a court order does not extend to the manner in which Defendant Gregory carried it out, including his use of deadly force against Mr. Butler.

49. As a direct and proximate result of Defendant Gregory's unconstitutional conduct, Sherman Lee Butler suffered excruciating physical pain, terror, and loss of life.

**COUNT II: 42 U.S.C. § 1983 —**
**FOURTH AMENDMENT EXCESSIVE FORCE**
**(Against Defendants Chancellor Ferrell and Jose Martinez)**

50. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

51. Under the Fourth Amendment, Mr. Butler had a clearly established right to be free from the unreasonable use of intermediate, non-deadly force.

52. Defendants Ferrell and Martinez knew Mr. Butler was experiencing a severe psychiatric crisis and was holding a blade to his own neck in a suicidal posture.

53. Defendants' decision to deploy Tasers against a suicidal individual who posed no immediate threat to others was objectively unreasonable, contraindicated by standard police de-escalation protocols, and served only to escalate the encounter to a deadly confrontation.

54. In assessing the reasonableness of this force, Defendants' violations of their own mandatory DPD directives—including the directive restricting Taser use against a member of a "Special Population," the directive requiring officers to await the Crisis Intervention Team, and the directive requiring de-escalation of mental-health encounters—are probative evidence that the force was excessive. Although a violation of department policy does not by itself establish a constitutional violation, it is relevant to whether Defendants' use of force was objectively reasonable under the totality of the circumstances.

55. Because Mr. Butler was in psychiatric crisis, was not under arrest, posed no immediate threat to others, and was of diminished capacity, Defendants were required to de-escalate the situation and to adjust their use of force downward rather than escalate it. Their decision to do the opposite was objectively unreasonable.

56. As a direct and proximate result of the unconstitutional taser deployments, Mr. Butler suffered physical pain, panic, and involuntary movements that directly preceded and caused the fatal shooting.

## COUNT III: 42 U.S.C. § 1983 — *MONELL* LIABILITY (Against Defendant City of Detroit)

57. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

58. The City of Detroit, through DPD, has a duty to train, supervise, and discipline its police officers to ensure they do not violate the constitutional rights of citizens, including those suffering from mental illness.

59. DPD has a custom, policy, or widespread practice of failing to adequately train its officers in de-escalation strategies, the proper management of individuals in psychiatric crises, and the mandatory deferral to CIT units when such units are actively en route.

60. In addition, and in the alternative to any failure-to-train theory, the City maintained a custom of tolerating, and of failing to meaningfully investigate and discipline, officers who violate DPD directives governing the use of force and the handling of individuals in mental-health crisis. The existence of written directives did not prevent the constitutional violations here because the City failed to enforce them; its disciplinary process lacked meaningful consequences for officers who disregarded the directives designed to protect constitutional rights.

61. On information and belief, the City's failure to discipline the Defendant officers was consistent with a clear and persistent pattern of prior instances in which DPD officers used excessive force against, or failed to accommodate,

individuals in mental-health crisis without meaningful investigation or discipline. That pattern placed the City's policymakers on notice that DPD's failure to enforce its own directives was likely to result in constitutional violations, and the City's continued inaction reflected deliberate indifference to that known risk.

62. This lack of training, supervision, and discipline constitutes deliberate indifference to the constitutional rights of individuals with mental disabilities, which DPD knew or should have known would result in excessive force and death.

63. The City's failure to train, supervise, and discipline its officers, and its custom of tolerating directive violations, was the moving force behind the violation of Sherman Lee Butler's constitutional rights. It was highly predictable that officers who faced no meaningful discipline for disregarding de-escalation, CIT-deferral, and Special-Population directives would continue to disregard them, with fatal consequences.

**COUNT IV: TITLE II OF THE AMERICANS WITH DISABILITIES ACT (Against Defendants City of Detroit and 36th District Court)**

64. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

65. Title II of the ADA, 42 U.S.C. § 12132, prohibits public entities from discriminating against individuals with disabilities and requires them to provide reasonable accommodations.

66. Mr. Butler suffered from a severe mental illness, which constituted a disability that substantially limited one or more major life activities under the ADA.

67. Defendants knew of Mr. Butler's disability prior to making contact with him.

68. The reasonable accommodation available to Defendants was to wait for the Crisis Intervention Team and mental-health clinician who had already been dispatched and were minutes away, and to employ the psychiatric de-escalation techniques that DPD's own directives required. This was a modest accommodation that would not have fundamentally altered the eviction.

69. No genuine exigency excused the failure to accommodate. Any exigency was created by Defendants themselves, who forced entry into Mr. Butler's apartment rather than securing the scene and waiting for the specialized unit that was en route. Before Defendants forced entry, Mr. Butler posed a threat only to himself.

70. Defendant City of Detroit is liable under Title II not on a theory of vicarious liability, but because of its own deliberate indifference to the known need to accommodate individuals in mental-health crisis, including its failure to ensure that its officers deferred to the Crisis Intervention Team program, which denied Mr. Butler the benefits of its services.

71. Defendant 36th District Court is liable under Title II as the public entity responsible for the conduct of its court officer, Bailiff Gregory, in the provision of its eviction-enforcement services, which failed to accommodate Mr. Butler's disability. This claim is premised on conduct that also violated Mr. Butler's Fourteenth Amendment rights and therefore falls within Congress's valid abrogation of Eleventh Amendment immunity.

72. These failures to accommodate directly resulted in the escalation of the encounter and Mr. Butler's death.

**COUNT V: STATE LAW ASSAULT AND BATTERY / WRONGFUL DEATH**
**(Against Defendants Craig Gerrell Gregory, Jose Martinez, and Chancellor Ferrell)**

73. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

74. Defendants Martinez and Ferrell committed an assault and battery upon Mr. Butler by intentionally deploying Tasers to shock him without his consent and without legal justification.

75. Defendant Gregory committed an assault and battery upon Mr. Butler by shooting him multiple times in the torso without consent and without legal justification.

76. The actions of the Defendants were the direct and proximate cause of Mr. Butler's severe physical injuries, conscious pain and suffering, and subsequent death.

77. Defendants are liable under the Michigan Wrongful Death Act, MCL § 600.2922.

**COUNT VI: STATE LAW GROSS NEGLIGENCE**
**(Against Defendants Craig Gerrell Gregory, Jose Martinez, and Chancellor Ferrell)**

78. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

79. Defendants owed Mr. Butler a duty of care to perform their official tasks in a non-negligent, reasonable, and safe manner.

80. Defendants breached this duty, acting with gross negligence—defined as conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results—by forcing entry, failing to wait for the CIT unit, failing to de-escalate, and using improper force.

81. As a direct and proximate result of Defendants' gross negligence, Sherman Lee Butler suffered severe injuries and lost his life.

**COUNT VII: 42 U.S.C. § 1983 —**
**FOURTEENTH AMENDMENT STATE-CREATED DANGER**
**(Against Defendants Chancellor Ferrell and Jose Martinez)**

82. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

83. The Fourteenth Amendment protects the right to personal security and bodily integrity, including the right not to be subjected to a state-created danger of violence at the hands of a third party.

84. Through their affirmative acts, Defendants Ferrell and Martinez created or substantially increased the danger that Mr. Butler would be subjected to deadly force. Those affirmative acts included forcing entry into his apartment rather than waiting for the en-route Crisis Intervention Team, escalating the confrontation, permitting Bailiff Gregory to take a confined tactical position in the bedroom during an active threat, and deploying Tasers that caused Mr. Butler to lunge forward, directly precipitating the shooting.

85. These affirmative acts placed Mr. Butler in a worse position than he occupied before Defendants acted. Before Defendants forced the encounter, Mr. Butler was alone in his bedroom and a danger only to himself.

86. Defendants' conduct created a special danger to Mr. Butler specifically, as distinguished from a risk to the public at large; he was the identified individual whom Defendants' actions placed at risk.

87. Defendants acted with the requisite culpability. Although the Crisis Intervention Team and clinician were only minutes away, Defendants had the opportunity to deliberate and chose to escalate rather than wait, in deliberate

indifference to the substantial and obvious risk of serious harm to Mr. Butler. Their conduct shocks the conscience.

88. As a direct and proximate result of Defendants' affirmative acts, Mr. Butler was shot and killed.

**COUNT VIII: 42 U.S.C. § 1983 — FAILURE TO INTERVENE**
**(Against Defendants Chancellor Ferrell and Jose Martinez)**

89. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

90. A law enforcement officer who observes or has reason to know that excessive or deadly force is being, or is about to be, used, and who has both the opportunity and the means to prevent the harm, has a duty to intervene.

91. Defendants Ferrell and Martinez knew that Bailiff Gregory had positioned himself in the confined bedroom with his firearm, that Mr. Butler was in acute psychiatric crisis, and that the encounter was escalating toward the use of deadly force. They coordinated the decision to deploy their Tasers while Gregory stood armed nearby.

92. Defendants had the opportunity and the means to prevent the use of deadly force by declining to escalate, by directing Bailiff Gregory to withdraw from the confined space, and by waiting for the specialized Crisis Intervention Team that was en route. Defendants failed to take any of these steps.

93. As a direct and proximate result of Defendants' failure to intervene, Mr. Butler was shot and killed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Estate of Sherman Lee Butler, respectfully requests that this Court enter judgment in its favor and against Defendants, granting the following relief:

- **Compensatory Damages** in an amount to be determined at trial for conscious pain and suffering, loss of life, loss of companionship, and emotional distress;

- **Punitive Damages** against the individual Defendants in their individual capacities for their reckless, malicious, and callously indifferent conduct;
- **Reasonable Attorney Fees and Costs** pursuant to 42 U.S.C. § 1988 and the ADA; and
- Any such other and further relief as this Court deems just and equitable.

Date: October 9, 2026

Respectfully submitted,

/s/ Dionne E. Webster-Cox
**Dionne E. Webster-Cox (P70422)**
Webster Law Office, PLLC
24100 Southfield Road, Suite 100
Southfield, MI 48075
(734) 215-2444 / (734) 943-6069 – fax
DEWC@WebsterLawOfficePLLC.com

/s/ Maurice Davis
**Maurice Davis (P76203)**
1300 Broadway St.
Detroit, MI 48226
(313) 462-4755 / (248) 286-6004
Maurice@michiganinjurylawyer.com

# Exhibit 1 - Commission Findings

# INTER-OFFICE MEMORANDUM

BOARD OF
POLICE COMMISSIONERS
OFFICE OF THE CHIEF INVESTIGATOR

Date: 03/06/2025

To: Board of Police Commissioners (Through Channels)

Subject: CITIZEN COMPLAINT INVESTIGATED BY THE OFFICE OF THE CHIEF INVESTIGATOR

Attached for your review and approval is the following Citizen Complaint Investigation completed by the Office of the Chief Investigator.

**NAME OF COMPLAINANTS**
Ms. [redacted]

**CASE NO.**
**CCR** 79425
**BPC** 25-116

## CITIZEN COMPLAINT REPORT INVESTIGATION

| INVOLVED MEMBER(S) | DPD MANUAL DIRECTIVE POLICY VIOLATIONS |
| --- | --- |
| **Police Officer** Jasmine Turner<br>**Badge #** 7809<br>Communications Operations | DPD Manual Directive, 201 - Patrol Operations, 201.1 Patrol, 201.1 - 14 Civil Process, 1, and 2. |
| **Police Officer** Porscha McCoy<br>**Badge #** 3269<br>Mental Health/ Co-Response | DPD Manual Directive, Special Order (22-28), Responding to Mental Health Crises, 201.5 Mental Health Co-Response Team and Citywide CIT Response.<br>DPD Manual Directive, Special Order (22-33), 301.1 Radio Procedures, Radio Runs, Failure to Acknowledge a Run. |
| **Police Officer** Julian Chavies<br>**Badge #** 239<br>Mental Health/ Co-Response | DPD Manual Directive, Special Order (22-28), Responding to Mental Health Crises, 201.5 Mental Health Co-Response Team and Citywide CIT Response.<br>DPD Manual Directive, Special Order (22-33), 301.1 Radio Procedures, Radio Runs, Failure to Acknowledge a Run. |

# INTER-OFFICE MEMORANDUM

BOARD OF
POLICE COMMISSIONERS
OFFICE OF THE CHIEF INVESTIGATOR

Date: 03/06/2025

**Police Officer** Chancellor Ferrell
**Badge #** 2114
12th Precinct

| |
|---|
| DPD Manual Directive 201 - Patrol Operations, 201.1 Patrol, 201.1 - 10 Radio Runs. |
| DPD Manual Directive, 201 - Patrol Operations, 201.1 Patrol, 201.1 - 14 Civil Process, 3. |
| DPD Manual Directive, 201 - Patrol Operations, 201.1 Patrol, 201.1 - 14 Civil Process, 3. |
| DPD Manual Directive, 201 - Patrol Operations, 201.1 Patrol, 201.1 - 14 Civil Process, 4. |
| DPD Manual Directive, Special Order (22-28), Responding to Mental Health Crises, 201.5, Mentally Ill and Homeless Persons, Procedures, Recognizing Abnormal Behavior 1 and 2. |
| DPD Manual Directive, Special Order (22-28), Responding to Mental Health Crises, Procedures, When Encountering an Individual Experiencing a Mental Health Crisis. |
| DPD Manual Directive, 102 – Standard of Conduct, 102.3 Code Of Conduct, 102.3 - 5.2 Courtesy, 2. |
| DPD Manual Directive, 304.7 – 4.4 Taser X2 Conducted Energy Weapon (CEW), Special Populations (a. & b.) |

**Corporal** Kenneth Downer
**Badge #** 0411
12th Precinct

| |
|---|
| DPD Manual Directive 201 - Patrol Operations, 201.1 Patrol, 201.1 - 10 Radio Runs. |
| DPD Manual Directive, 201 - Patrol Operations, 201.1 Patrol, 201.1 - 14 Civil Process, 3. |
| DPD Manual Directive, 201 - Patrol Operations, 201.1 Patrol, 201.1 - 14 Civil Process, 3. |
| DPD Manual Directive, 201 - Patrol Operations, 201.1 Patrol, 201.1 - 14 Civil Process, 4. |
| DPD Manual Directive, Special Order (22-28), Responding to Mental Health Crises, 201.5, Mentally Ill and Homeless Persons, Procedures, Recognizing Abnormal Behavior 1 and 2. |
| DPD Manual Directive, Special Order (22-28), Responding to Mental Health Crises, Procedures, When Encountering an Individual Experiencing a Mental Health Crisis. |
| DPD Manual Directive, 102 – Standard of Conduct, 102.3 Code Of Conduct, 102.3 - 5.2 Courtesy, 2. |

# INTER-OFFICE MEMORANDUM

BOARD OF
POLICE COMMISSIONERS
OFFICE OF THE CHIEF INVESTIGATOR

Date: 03/06/2025

**Police Officer** Arthur Goff
**Badge #** 1072
12th Precinct

| |
|---|
| DPD Manual Directive 201 - Patrol Operations, 201.1 Patrol, 201.1 - 10 Radio Runs. |
| DPD Manual Directive, 201 - Patrol Operations, 201.1 Patrol, 201.1 - 14 Civil Process, 3. |
| DPD Manual Directive, 201 - Patrol Operations, 201.1 Patrol, 201.1 - 14 Civil Process, 3. |
| DPD Manual Directive, 201 - Patrol Operations, 201.1 Patrol, 201.1 - 14 Civil Process, 4. |
| DPD Manual Directive, Special Order (22-28), Responding to Mental Health Crises, 201.5, Mentally Ill and Homeless Persons, Procedures, Recognizing Abnormal Behavior 1 and 2. |
| DPD Manual Directive, Special Order (22-28), Responding to Mental Health Crises, Procedures, When Encountering an Individual Experiencing a Mental Health Crisis. |
| DPD Manual Directive, 102 – Standard of Conduct, 102.3 Code Of Conduct, 102.3 - 5.2 Courtesy, 2. |

**Corporal** Jose Martinez
**Badge #** 4216
12th Precinct

| |
|---|
| DPD Manual Directive 201 - Patrol Operations, 201.1 Patrol, 201.1 - 10 Radio Runs. |
| DPD Manual Directive, 201 - Patrol Operations, 201.1 Patrol, 201.1 - 14 Civil Process, 3. |
| DPD Manual Directive, 201 - Patrol Operations, 201.1 Patrol, 201.1 - 14 Civil Process, 3. |
| DPD Manual Directive, 201 - Patrol Operations, 201.1 Patrol, 201.1 - 14 Civil Process, 4. |
| DPD Manual Directive, Special Order (22-28), Responding to Mental Health Crises, 201.5, Mentally Ill and Homeless Persons, Procedures, Recognizing Abnormal Behavior 1 and 2. |
| DPD Manual Directive, Special Order (22-28), Responding to Mental Health Crises, Procedures, When Encountering an Individual Experiencing a Mental Health Crisis. |
| DPD Manual Directive, 102 – Standard of Conduct, 102.3 Code Of Conduct, 102.3 - 5.2 Courtesy, 2. |
| DPD Manual Directive, 304.7 – 4.4 Taser X2 Conducted Energy Weapon (CEW), Special Populations (a. & b.) |

# INTER-OFFICE MEMORANDUM

BOARD OF
POLICE COMMISSIONERS
OFFICE OF THE CHIEF INVESTIGATOR

Date: 03/06/2025

**To: Board of Police Commissioners (Through Channels)**

Attached for your review and approval is the following Citizen Complaint Investigation completed by the Office of the Chief Investigator's (OCI) **Timeliness Initiative Project.**

## CITIZEN COMPLAINT REPORT INVESTIGATION

| | | | | |
|---|---|---|---|---|
| **CCR:** 79425 | **BPC:** 25-116 | **Date of Complaint:** 01/24/2025 | **Date Assigned:** **01/27/2025** | **Due Date:** **04/24/2025** |
| **Title:** Police Commission Investigator | | | **Name:** Destini Staffney | |
| **Date of Incident:** 07/12/2024 | | **Time of Incident: 10:53 AM** | **Reassigned Date: N/A** | |

## COMPLAINANT/CO-COMPLAINANT INFORMATION

| | | |
|---|---|---|
| **Complainant Name:** **Ms.** [redacted] | **Phone Number:** [redacted] | **E-Mail:** [redacted]**@gmail.com** |
| **Address: N/A** | | |
| **Complainant Interview:** In-Person Interview | **Date: February 17, 2025 at 4:05 pm.** | **Contact Letter Date: 02/07/2025**<br>**Update Letter Date: N/A** |

## WITNESS INFORMATION (NONE IDENTIFIED)

## CANVASS

| | |
|---|---|
| **Conducted:** Yes | **Additional Details:** A canvass was completed at 17655 Manderson Road, Apt 101, Detroit, MI 48203 on January 30, 2025; however, no contact was made with any potential witnesses. |

## INVOLVED MEMBER(S)

| | | |
|---|---|---|
| **Member Rank:** Civilian | **Member Name:** Jasmine Turner | **Badge No.:** 7809 |
| **Command: Communications Operations** | **Former Assignment: N/A** | |
| **Interviewed: No**<br>**Date:** N/A | **Body-worn Camera Footage : N/A**<br>**Date and Time: N/A** | |
| **Representation: N/A** | **Type: N/A** | **Name: N/A** |

| | | |
|---|---|---|
| **Member Rank:** Police Officer | **Member Name:** Porscha McCoy | **Badge No.: 3269** |
| **Command: Mental Health/ Co-Response** | **Former Assignment: N/A** | |
| **Interviewed: No**<br>**Date:** N/A | **Body-worn Camera Footage :** Yes - Full<br>**Date and Time:**<br>**07/12/24 11:13:41 (Dash CAM/ In-Car Video Camera)**<br>**07/12/24 11:13:41 (BWC)** | |

# INTER-OFFICE MEMORANDUM

BOARD OF
POLICE COMMISSIONERS
OFFICE OF THE CHIEF INVESTIGATOR

Date: 03/06/2025

| | | |
|---|---|---|
| **Representation: N/A** | **Type: N/A** | **Name: N/A** |

| | | |
|---|---|---|
| **Member Rank:** Police Officer | **Member Name:** Julian Chavies | **Badge No.:** 239 |
| **Command: Mental Health/ Co-Response** | **Former Assignment: N/A** | |
| **Interviewed: No**<br>**Date:** N/A | **Body-worn Camera Footage :** Yes - Full<br>**Date and Time:**<br>**07/12/24 10:14:42 (BWC)**<br>**07/12/24 11:13:41 (BWC)** | |
| **Representation: N/A** | **Type: N/A** | **Name: N/A** |

| | | |
|---|---|---|
| **Member Rank:** Police Officer | **Member Name:** Chancellor Ferrell | **Badge No.:** 2114 |
| **Command: 12th Precinct** | **Former Assignment: N/A** | |
| **Interviewed: No**<br>**Date:** N/A | **Body-worn Camera Footage :** Yes - Full<br>**Date and Time: 07/12/2024 11:10 AM** | |
| **Representation: N/A** | **Type: N/A** | **Name: N/A** |

| | | |
|---|---|---|
| **Member Rank:** Corporal | **Member Name:** Kenneth Downer | **Badge No.:** 0411 |
| **Command: 12th Precinct** | **Former Assignment: N/A** | |
| **Interviewed: No**<br>**Date:** N/A | **Body-worn Camera Footage :** Yes - Full<br>**Date and Time: 07/12/2024 11:03 AM** | |
| **Representation: N/A** | **Type: N/A** | **Name: N/A** |

| | | |
|---|---|---|
| **Member Rank:** Police Officer | **Member Name:** Arthur Goff | **Badge No.:** 1072 |
| **Command: 12th Precinct** | **Former Assignment: N/A** | |
| **Interviewed: No**<br>**Date:** N/A | **Body-worn Camera Footage :** Yes - Full<br>**Date and Time: 07/12/2024 11:07 AM** | |
| **Representation: N/A** | **Type: N/A** | **Name: N/A** |

| | | |
|---|---|---|
| **Member Rank:** Corporal | **Member Name:** Jose Martinez | **Badge No.:** 4216 |
| **Command: 12th Precinct** | **Former Assignment: N/A** | |
| **Interviewed: No**<br>**Date:** N/A | **Body-worn Camera Footage :** Yes - Full<br>**Date and Time: 07/12/2024 11:07 AM** | |
| **Representation: N/A** | **Type: N/A** | **Name: N/A** |

## ADDITIONAL ELECTRONIC EVIDENCE (NONE IDENTIFIED)

| | |
|---|---|
| **Type:** Other | **Details: Detroit police partial body cam footage of deadly eviction shooting:** https://youtu.be/aJqN-vnBcgY |

# INTER-OFFICE MEMORANDUM

BOARD OF
POLICE COMMISSIONERS
OFFICE OF THE CHIEF INVESTIGATOR

Date: 03/06/2025

## AREAS OF CONCERN

| |
|---|
| **Findings:** Violation of DPD Manual Directive Policy<br>**DPD Directive:** Detroit Police Department Manual Directive, 201 - Patrol Operations, 201.1 Patrol, 201.1 - 14 Civil Process, 1 and 2. |
| **Findings:** Violation of DPD Manual Directive Policy<br>**DPD Directive:** DPD Manual Directive, Special Order (22-28), Responding to Mental Health Crises, 201.5 Mental Health Co-Response Team and Citywide CIT Response. |
| **Findings:** Violation of DPD Manual Directive Policy<br>**DPD Directive:** DPD Manual Directive, Special Order (22-33), 301.1 Radio Procedures, Radio Runs, Failure to Acknowledge a Run. |
| **Findings:** Violation of DPD Manual Directive Policy<br>**DPD Directive:** Detroit Police Department Manual Directive, 201 - Patrol Operations, 201.1 Patrol, 201.1 - 10 Radio Runs. |
| **Findings:** Violation of DPD Manual Directive Policy<br>**DPD Directive:** Detroit Police Department Manual Directive, 201 - Patrol Operations, 201.1 Patrol, 201.1 - 14 Civil Process, 3. |
| **Findings:** Violation of DPD Manual Directive Policy<br>**DPD Directive:** Detroit Police Department Manual Directive, 201 - Patrol Operations, 201.1 Patrol, 201.1 - 14 Civil Process, 3. |
| **Findings:** Violation of DPD Manual Directive Policy<br>**DPD Directive:** Detroit Police Department Manual Directive, 201 - Patrol Operations, 201.1 Patrol, 201.1 - 14 Civil Process, 4. |
| **Findings:** Violation of DPD Manual Directive Policy<br>**DPD Directive:** Detroit Police Department Manual Directive, Special Order (22-28), Responding to Mental Health Crises, 201.5, Mentally Ill and Homeless Persons, Procedures, Recognizing Abnormal Behavior 1 and 2. |
| **Findings:** Violation of DPD Manual Directive Policy<br>**DPD Directive:** Detroit Police Department Manual Directive, Special Order (22-28), Responding to Mental Health Crises, Procedures, When Encountering an Individual Experiencing a Mental Health Crisis. |
| **Findings:** Violation of DPD Manual Directive Policy<br>**DPD Directive:** Detroit Police Department Manual Directive, 102 – Standard of Conduct, 102.3 Code of Conduct, 102.3 - 5.2 Courtesy, 2. |
| **Findings:** Violation of DPD Manual Directive Policy<br>**DPD Manual Directive,** 304.7 – 4.4 Taser X2 Conducted Energy Weapon (CEW), Special Populations (a. & b.) |

## ADDITIONAL FINDINGS (NONE IDENTIFIED)